The United States Court of Appeals for the Ninth Circuit is now in session. Good afternoon, everyone, and welcome to the Ninth Circuit. It's so nice to be able to be here in person and see so many people in person in the courtroom. Welcome. We have just one case submitted on the briefs today, which is Guzman-Sogaranis v. Garland, 21-70694. That case is submitted. And we'll hear the other cases in the order in which they appear on the calendar. The first is Goodrum v. Tampkins, 19-56239. Each side will have ten minutes. Good afternoon, Your Honor. Tony Frombardi on behalf of Mr. Goodrum. Your Honor, this case is as clear as it was the last time it was before the court. The result, that is. And that being that this case should be remanded back to the district court for an evidentiary hearing on Mr. Goodrum's claims, on his false evidence claim, particularly the one that the court certified. Mr. Frombardi, if we do that, are we asking the district court to replace the determination of the trial jury, which heard evidence of all of the inconsistencies in the witnesses' statements to the police and his testimony across examination at trial? I'm not sure what you're asking the district court to do, because I think this is a different case than the one we had in Earp, where there had never been an evidentiary hearing at all. Why can't we resolve this on the existing state court record? Your Honor, because there was never any evidentiary hearing or any type of hearing regarding what Harry Polo, Howard Harry, had said after the trial. So, in other words, whatever is contained in Mr. Herring's affidavit, so an affidavit that was never presented to the jury or the court at any point in time. And I understand Your Honor's concern that there were inconsistencies in the record as to what Harry testified. His testimony was so inconsistent. That's correct, Your Honor. But what the jury never heard is the other stuff going on in the case, which is essentially people going in there intimidating him into changing his story. However, was his testimony at trial inconsistent? I understood him to say, you know, with various degrees of emphasis, I didn't see a pipe in his hand. I didn't see it. He never stated it wasn't there or it was there. Is that right? That's correct, Your Honor. And the only time he said it, he was cross-examined with whether he had once said to her, to the examining officer, that it was there. And he said, yes, I said that. Or I forget whether it was there or whether it wasn't there. I forget which. But which one was it? Well, the defense counsel during cross-examination asked, is it true that one time, at one point, you told him that he did have a pipe? He did say it, right? But that was just his statement about what he had said. In terms of when he testified to a trial, I didn't see what was so inconsistent about it. I thought he consistently said, I didn't see it, that it wasn't there. Not only, Your Honor, has made that observation, the court before the panel that handled this case before had made the same exact observation. The district court, twice, in two different separate opinions, had said the same thing. He was very clear. I mean, certainly we're not talking about somebody who is very articulate. You know, we're talking about Howard Herring. He was homeless at some point. This gentleman gets up there and says, I didn't see a pipe in his hand. But what we do know is that he did see a pipe in his hand, at least according to his affidavit. But he didn't say, I didn't see that there wasn't a pipe in his hand. Well, he says, I didn't see him coming with a pipe at Goodron at the time that he was shot. I understand. What does that say? Consistently, I didn't see a pipe in his hand, but not, I saw that there wasn't a pipe in his hand. And doesn't the declaration essentially provide additional impeachment evidence that the jury did not hear? And that's different from an affirmative statement, as Judge Berzon just teased out. And so whether he did or didn't see a pipe in the victim's hand at the time the shooting occurred. That would be true if that was the only aspect of his affidavit. We're talking about people going in there promising him things for his testimony. So if we were impeached without. But that goes to the motivation for why he testified in such a, I'll call it convoluted fashion. Correct. At trial where it was really hard to understand exactly what he saw. Well, the prosecutor seemed to think, seemed to have thought that Mr. Heron was very clear. Because she says it during closing arguments. Right. She said, look, he was right there, right next to Goodrum. He never saw a pipe. But I assume that the jury was also instructed, as we normally would, that they are the sole judges of the credibility. Correct. Notwithstanding the arguments of counsel during closing arguments. That's correct, Your Honor. That is absolutely correct. But we also know from case law and common sense that the jury is going to listen very carefully to the prosecution's summation. And in this case, when you look at the verdict, which was unreasonable, but good faith belief in self-defense. If they had believed that Mr. Goodrum had put that pipe next to the victim after he shot him. If they had believed that. Part of your problem, though, in making that defense is Mr. Goodrum's statement that I'm going to kill everyone. And I'm going into the house and getting a lever action rifle and coming back out. I mean, I could see where the – and he doesn't deny that he made that statement. That's inaccurate, Your Honor. He doesn't say that, actually. What happens is, it's stamped. The victim says, I'm going to go get a gun and blow this house up. So he goes into the car that him and his girlfriend were driving. No, no, no. I'm talking about Mr. Goodrum when he went in to retrieve the rifle. He doesn't dispute that he went into the house and witnesses said we heard him say he's going to kill everyone. And then he comes back out with a gun. Is that true? I don't remember that. No, I don't think Goodrum said that. I'm just recollecting. Remember, this was Goodrum's house. And this is a man who went to Goodrum's house and literally broke in and started threatening to kill everybody in the house and in the garage, including Goodrum. He sucker punched Goodrum at one point. He kicks an ax out at him. But it was Goodrum who went into the house to get the rifle that he got. He did at that point in time, Your Honor, when Stamps had said I'm going to go get a gun from the car and from previously. He actually did get an ax, right? He did get an ax at one point. He did get an ax. He came rushing Goodrum with it. Then apparently that may have alleviated a little bit to some extent, not much. But then Stamps, who was just going all over the place, then he says, I'm going to go grab a gun. Grab a strap and kill everybody in the house. And so Goodrum goes into the house and gets a gun, which is natural, Your Honor. Anybody who has a gun at that point would want to be able to defend himself at that point. But then the jury heard the pathologist's testimony with regard to the sequence of the two rounds that were fired and the fact that if he hit him first in the chest, he might have been able to move or say something before the second shot was fired, which required Mr. Goodrum to activate the lever, eject the spent round, and load the second round, which is evidence that the jury could consider in deciding whether or not this is a voluntary manslaughter. Right. They could have considered it, Your Honor, appropriately so if they had all the facts. That's the hardest point for your argument, isn't it? Because if, in fact, the evidence was that he shot him a second time when there fairly indisputably wasn't a danger and anything that Herring would have said in his affidavit go to that question of whether the second shot could have been in self-defense. Well, Your Honor, it happened, according to Herring, it happened very quickly, the two shots. It happened one after another. And I think Mr. Goodrum has some experience in the Army that he was able to do what he did as quickly as he was able to do. And remember, the pathologist is saying the first shot was near, almost touching the skin as he shot him. From the stippling, right? Yeah, from the stippling, exactly. And then the second shot may have been anywhere from a foot away. So he could have been, as Goodrum is testifying, that he was motioning with a pipe. And this was a pipe that the prosecutor was using. And he was still motioning. Yeah, but he was able to do that. The pathologist made that clear that he would have been able to still move, talk, and do what, you know, hurt somebody, essentially. And he shot him. Is there anything in the record at all the kind that Judge Thomas suggested of Goodrum saying that could kill her? I didn't think so, but I may. Not that I remember, Your Honor. I'll be happy to look for it when I'm sitting down, but not that I saw Goodrum ever saying that, Your Honor. Could I bring you back to the prosecutor's statement at closing argument? Yes, Your Honor. So if we think that the testimony was just very muddled, so it's not clear whether he saw a pipe or didn't see a pipe or anything, but the prosecutor says he testified he didn't see a pipe, do you have any case that says the prosecutor's characterization can turn the muddled testimony into something that's false? I can't say I have a case where I'm pointing on it, but I have many cases that say that a prosecuting type from this court that is saying that the prosecution's statements matter a lot. In fact, Judge Kuczynski wrote it matters a great deal. I'm just wondering, I mean, the claim here is a, I don't know how to say it, but a Naipoo claim, and it seems that the prosecutor's statement is maybe some other kind of misconduct, or maybe the failure to object to it was ineffective assistance of counsel, or it seems like there may be a mismatch between the prosecutor closing argument argument and the Naipoo argument. Well, I brought the prosecution's closing argument because it's consistent with what the court has said, Herring has said, all throughout his testimony, and it's inconsistent with his affidavit. But I bring that up, Your Honor, because in order for us to assess the prejudice, we'll have to see how important Herring's testimony was to the prosecution. And here Herring's testimony was very important. In fact, he was the only person at the time who was standing right next to a good old Naipoo. So you're using the closing for prejudice, but not for proving falsity. Yes, Your Honor. I couldn't, as Judge Tomlin pointed out, because of the jury instruction, it would be difficult to say that the jury accepted that as a fact, but we know from case law that the jury does, in fact, accept those as facts. I have one other question. How, um, so the Naipoo standard involves falsity, and then the prosecutor or the police let somebody, somebody from the government, knew that it was false. Yes. What's your evidence of that? Well, Herring's affidavit. Well, Herring's affidavit says that they were, that they were coercing him, so to speak. Right. But couldn't they be coercing him because they thought, or telling him they were going to charge him with perjury because he believed it wasn't true what he was going to say? Well, I mean, the jury makes a determination of what is true or not with all the evidence. I understand that. But how can we, where do we get the fact that they knew it wasn't true as opposed to they thought it was true and therefore, they knew it was true and therefore tried to coerce him not to say it versus they knew his statement was. . . I'm having myself a little bit. . . And the way I would answer that, Your Honor, would be that Herring says in the affidavit that the first time that he spoke to Detective Rivera, he told her that Herring had a pipe in his hand at the time that he was shot. Right. That's the second time. We have the transcript of the second time. Right. And he gets confronted. She shouted that he said that again. And she said, but you said otherwise last time. And he said, no, I didn't say that last time. And finally, she talked him into the fact that he did say it last time. Maybe that's what he meant by she was going to charge him with perjury. But still, if they had interviewed all these other people, why couldn't they have thought that he was wrong, that it wasn't a bogus act? Because nobody saw the shooting as well as Herring. Herring was the guy, the only other person. One of the girlfriends. Lorraine Moray. Yeah, her statement that the victim picked up a pipe and Goodroom shot him. Lorraine Moray does say that to other people who were there. But she witnessed the shooting, did she not? She did. And Lorraine Moray's testimony, Your Honor, I don't know if you had an opportunity to look at it, but it's all over the place. I mean, she was simply incredible. Well, to follow up on Judge Burr's last concern, what's wrong with the trial lawyer saying, you know, I don't know whether Herring's telling the truth or not. Let the jury make that determination. With all the facts. Yeah, exactly. With all the facts. With all the stuff that Herring is saying, if we assume that to be true, which we must at this stage of the proceeding, Your Honor, if we assume that to be true, when people went into the prison, they intimidated them, they put them away so you wouldn't testify in a plenary hearing. But that gets back to my first question about you. In essence, you want the district court to redetermine credibility of the evidence that the state presented at trial in this hearing on remand. I'm just not. The trial evidence oftentimes, when we have an evidentiary hearing, that's exactly what we do. We take the trial evidence. Well, usually it involves evidence that was never presented to the state court, and here we can't say that. Well, it was presented, and they should have held an evidentiary hearing. They didn't. Well, what wasn't presented was his current statement, which is a little hard to tease out even from the affidavit. I read it carefully, and he does seem to say, although not in hank verba directly, that he did see the person with the body in his hand. Again, these are people who are not very articulate. What we do have is two people attested to his affidavit. I've spoken to Mr. Herring before. Who was attesting to his affidavit? Two people. Oh, I see. No, all I'm saying is it's not lucid, but it's there. That he's now saying, when I said I didn't see it or it was obstructed or whatever, which I still think was consistent, actually, that wasn't true. I did see it. Yes, that's a different version. So it's not just, you know, maybe I did or I didn't see it. So that's the problem here. You know, we don't know what the jury would have decided. What did he say during the trial, maybe I did, maybe I didn't? I thought he said consistently I didn't see it. Sometimes he said I didn't see it. He elaborated later and said I didn't see it because I wasn't in a place where I could see it. But his overall message was I couldn't tell because I wasn't in a place where I could see it, not that I saw that I didn't have it. That's correct, Your Honor. That would be a fair assessment of the record, Your Honor. Unless the Court has any questions, I would like to be able to reserve maybe a minute for rebuttal, if possible. Thank you, Your Honor. Thank you. Good afternoon, Your Honors. Michael Butera for Respondent Appellee, and may it please the Court. The District Court properly denied Alex Gaby's petition without the need for an evidentiary hearing. The claims were entirely premised on an uncorroborated affidavit, and the District Court properly held that even crediting these accusations at face value, Goodron would not have been able to satisfy the three prongs necessary to prevail on a NAPWA claim. Why so? I'm sorry, Your Honor. Why not? Turning first to the question of whether or not the victim was wielding a pipe, I think this Court's last line of questioning hits the nail right on the head. Appellant must demonstrate under the second prong of NAPWA that the prosecutor knew or should have known that the victim in fact had a pipe in his hand, and nonetheless coerced Herring to testify otherwise. There is nothing in the proffered affidavit that supports that conclusion. Instead, Herring's incriminating version of events matched what he told police in a recorded interview, which was that he didn't actually see— And then she said, but that's not what you told me last time. And he said, oh, yes, I did. And then she says, oh, no, you didn't. And then he backs off it. I mean, and this may be what he meant by she was threatening him with perjury. She didn't actually threaten him with perjury, but you told him that he had said something else before. And he now says that isn't so. So there is something that's quite different, isn't there? He says, I never—he now says, I never told her that, although she kind of—she wrote down what she wanted to hear, essentially. So, Your Honor, I think the colloquy at 2 ER 111 through 113 gives us a good clarification of what this is, because at one point he does say that I believe the direct wording was he maybe had a pipe. The officer—I mean, the detective pushes back and says that's not what you told me the first time, at which point he clarifies, oh, in fact, I saw a pipe lying next to the body after the shooting and had assumed that he was holding the pipe, but that he hadn't actually seen it. And so I think by 2 ER 113, he's agreeing with the statement that consistent with what he said the first time, he did not see a pipe in the hand, but made an assumption based on where the pipe was relative to the body after the shooting that occurred, which, again, is consistent with the testimony offered at trial. But again, even if we accept that there are discrepancies between the statements he made to police and what were offered at trial, the issue is whether or not it was so clear that the victim had a pipe that the prosecutor—any reasonable prosecutor would have known that the testimony they were listing was false. And that certainly isn't the case here, given independent, cooperating evidence. There were two other eyewitnesses that either testified that they did not see any pipe in the victim's hand. Can I just go back to what you said before? I mean, I do think it's a bit of a truncation of what was said at the interview. He says, he had maybe a metal pipe or something, I don't know. And then she says, you never said you had a metal pipe in your hand. He says, I don't even understand that I did see a metal pipe. I don't think I said that at all. And then she says, I've got it written down, because I specifically asked for that. And he said, you didn't remember seeing one. Well, you'll have to show me that. And then, you know, and then he backs off. But he began by saying quite definitively that he did see a metal pipe. So, Your Honor, I still believe that by 2 ER 113, the detective is saying, okay, so that's pretty much what you said, you don't remember him having anything in his hands. And he responds, yeah. Well, that's true, he did. And by that point, for whatever reason, he backed off. Sure. And so I think we have an initial statement that is later clarified. There is certainly no dispute that the detective pushed back against the idea that there was a pipe, but there was certainly no threat or coercion. The state, the detective pointed out an inconsistency between what she believed he had said at the first hearing and what he was saying, and he confirmed that it was the incriminating version of events by the end of their exchange. But, again, even accepting that Herring may have offered irreconcilable statements, the relevant inquiry is whether the prosecutor knew or should have known that the factual statement was false. Can I stop you there, because you were starting to say this before, but I don't think it's right to say that the real issue is whether there was a pipe. Isn't the real issue whether Herring thought he saw a pipe? I mean, it could have been a wrench, it could have been something else. If there was something that Herring thought he saw, the real question is what did Herring think? And then did they coerce him into saying something different than what he thought? The real truth of the matter is not really the point, is it? So I think that the testimony, both in its significance and its truth, has a subjective and objective component. Because if there was, in fact, not a pipe in the victim's hand, then subjective testimony that someone believed that they had a pipe in their hand would be the false testimony. I think that in order to satisfy the second part of the NAPLA claim, the substance of the testimony would have to be false, not merely the subjective interpretation of it. Well, if Herring really thought he saw a pipe, having him be on the stand saying, I really thought I saw a pipe, you're saying if the prosecutors had a reason to think there wasn't a pipe, even if Herring truly thought there was, that that would be false testimony by Herring? I wouldn't go that far, Your Honor. I would say that in light of the other independent testimony regarding whether or not there was a pipe, the prosecutor had a reasonable interpretation to disbelieve that Herring actually believed that. I think that all of the affidavit evidence is perfectly consistent with the issue of him saying, I don't believe your later exculpatory version of events, especially because of the fact that there was evidence in the record that Herring and the defendant were good friends and that the defendant's girlfriend had spoken with him and said you're the only chance he has to get off. And so I think that the prosecutor had ample reason to reject the exculpatory version of events and accept the version of events that he had offered that was consistent with other evidence presented by other witnesses. And your argument is that it doesn't meet the second NAPUI, I think that's how I pronounce it, claim or prong that the prosecutor must have known that the testimony was actually false. Yes, Your Honor, but also the materiality claim, if I could jump to that quickly. I think as we discussed, the issue of whether or not the victim had a pipe was contested at trial. However, what I think we're missing the point of is that while this is a necessary fact to establish a self-defense claim, it is by no means sufficient. California law states that a person does not have a right to self-defense if they provoke a fight or a quarrel as an excuse to use force, that they may only use an amount of force which is necessary to repel an attack, and that they must cease using force once the danger has dissipated. And I think looking at the totality of circumstances, there is no reasonable likelihood that this could have affected the jury's verdict, given the testimony from the medical examiner and Haring himself, which leads to the conclusion that the chest wound occurred first and when the victim was closer. The victim clutched his torso, said something to the effect of, you shot me, at which point... But then you have to assume that it was obvious at that point that he was, you know, going to drop down and die or drop down and not be a danger anymore, and he didn't, in fact, before he was shot the second time. And there is some Haring, I think, is now saying that he still had the pipe and was still swinging it around. So how is, why would a jury not be able to conclude necessarily that Gundram, you know, thought he was still in danger? Your Honor, I think the evidence at trial forecloses that for two reasons. Beyond the witness testimony about a pause between the first shot and the second shot, we have the stippling evidence and the carbon monoxide test, which showed that the second shot occurred at a farther distance than the first shot, which means that the victim must have been shot in the head at a further distance and he must have recoiled away from the shooter, not further towards the shooter. The second thing we have is the, I'm sorry, the fact that the head wound occurred second, that the process of reloading a bolt-action rifle, as the ballistics expert testified to, is an involved process in which one has to pull the bolt back in order to eject the spent casing and then pull it forward to re-chamber another round. This couldn't have been a one-two. There must have necessarily been an action of reloading the lever-action rifle. And so, for those reasons, we don't believe that there could have been, that he could have prevailed on materiality, even accepting any testimony regarding the pipe. Counsel, what kind of a rifle was it? I can't remember the name. I know that it was a bolt-action mechanism, a .22 caliber. Did it have a clip, or was the magazine beneath the chamber? I don't believe that a bolt-action rifle can have a clip. I believe that it is a lever. I thought this was a lever action, not a bolt action. I would have to check. I'm sorry. The lever-action rifle, as Mr. Fermani pointed out pretty quickly, it can offer that second shot, and if the victim was only a foot or more away when the second shot was fired, he didn't move very far when the second round hit him. I'll have to check. I know for a fact that the mechanism required the ejection and re-chambering of the round, and that the shot to the head occurred at a further distance than the shot to the chest. But if it's a lever-action rifle, it's all done with activating the lever, and you can do that within a second or two. Your Honor, we would argue that even within that pause period, given the fact that there was testimony that this was shot further away, that the victim was clutching their chest, exclaiming incredulously, you shot me, that a jury would have no choice but to conclude that any danger had ceased at that time. Not really. If you had enough wherewithal to say you shot me, and he wasn't flying to the ground, and if he had the pipe and still had the pipe, how was Mr. Gundrum supposed to know that this was ultimately lethal, but it wasn't lethal at the time? Your Honor, I think we can see that from, I believe it was the trajectory of the head shot, was to the side of the head, and again, the distance of two feet versus several inches shows that the victim was recoiling and turning at the time. Isn't the NAPU materiality standard pretty low? That is, there has to be a reasonable possibility that it could have affected the jury. So really, to put it all together, if there was an evidentiary hearing, and it appeared that Mr. Herring testified credibly to the judge at that point, that he did see the pipe in his hand. He did see Mr. Stamps advancing onto Mr. Gundrum with the pipe in his hand. And then he, and moreover, he knew that he had put the pipes one place and that when Mr. Stamps was lying there, it was someplace else other than where he put it to begin with, and it had blood on it, the pipe had blood on it. And then that there was a very short period of time between the two shots, and so that a jury could have thought that he still thought he was reasonably and logically thought he was still in danger. Why wouldn't you then go to a new trial at that point? So, Your Honor, we acknowledge that materiality is not an especially onerous standard, but certainly we believe it has teeth when you're talking about undisputed, ballistics evidence as to the circumstances under which the second shot occurred at. So our argument is that even if we believed every word that the affidavit says about the pipe in the initial instance, the proportionality to force would still exceed anything that could have established self-defense under California law. But slightly differently, why wouldn't you have an evidentiary hearing to figure all this out instead of sitting on a bunch of suppositions about how the affidavits and the trial evidence fit together and so on? Your Honor, an evidentiary hearing is required only where the evidence presented in a habeas petition would show a reasonable prospect of entitlement to relief, and there is the requirement of making a credibility determination among competing evidence. Our argument is that the affidavit is facially deficient, that accepting every word of the evidence offered by him would not establish the three prongs of NAPRA, all three of which must be established. And so we believe that even if there were potentially a question about something we could learn about whether or not the pipe was in the victim's hand, our argument is that there is nothing material within the affidavit that gives us any insight into a suggestion that the prosecutor knew this was false or that he would have been able to prevail on self-defense. And so our argument is that the petitioner has failed to carry the initial burden, and no NAPRA evidentiary hearing would be futile. We've taken you over your time, so thank you, counsel, for the helpful argument. Thank you, Your Honors.  Well, I really don't have much to add because I think the court is familiar with the issues and whatnot, but I will say just to point out, all witnesses testified that the sequence of the shots were very quick, quickly to be shot, that they happened very quickly to open. And you answered my question. You shot the murder weapon. The murder weapon, I believe, Your Honor, was the one that doesn't have the one that you were referring to. Oh, where the rounds are basically pushed down below the firing chamber. Yes, Your Honor, and I can definitely verify that for you, Your Honor, if need be. But as far as the witnesses who were there at the time. Did anybody supply a photo in the excerpts of record? I don't think I saw. Not a photo of the rifle, but I can definitely find it. There are exhibits in the Superior Court. I can get those. That's no problem at all. I can look in my file because it was an actual innocence claim initially when he came. Well, unless counsel disagrees with your characterization of the rifle, I think that answers my question. Thank you, Your Honor. What about the, I have to go back again. Sure. What in the affidavit addresses the knowledge question? Well, to me, Your Honor, the affidavit and the court's interpretation of that affidavit is what Your Honor pointed out, which is if, in fact, Herring believed that there was a pipe in Stamps' hands at the time of the shooting, then the fact that he has to alter that testimony for whatever motivation, but we have some serious motivations here that led him to do this. But if, in fact, he has to change that and say, no, he didn't have any pipe in his hand, that's false. We know, for example, he says that earlier there a reminder that she would charge him with perjury, and we know for sure that she didn't say that in hypoverba, at least in the second interview. That's correct, Your Honor. So maybe he surmised that from her saying you didn't say that the first time. Or afterwards, Your Honor. Or afterwards. We just don't know. That's the ambiguity in this case that we don't know what went on when they visited him, when Edward Sergott visited him in prison or in jail, when they were looking for him at the preliminary hearing and they couldn't find him, and then the prosecutor is up there telling the judge, no, no, you don't need to continue this. We don't need to hear from Herring. We can't even find him. And meanwhile, he's in Sethbury Ranch this whole time, and they put him there. That's according to Herring's affidavit. Okay, but he didn't testify at the trial. I mean, there's an argument there about the preliminary hearing, and, frankly, I don't understand the argument. Well, the argument being that they misrepresented his word about starting court to the judge. I understand. But they actually produced him at the trial. So I'm trying to understand how there's any harm there. Well, this is a unique case, Your Honor, in the sense that even the judge points it out at the preliminary hearing that they put all the defense, both parties put their cases up front. And there was a possibility, and the argument would be, Your Honor, there was a possibility that, number one, that he would not have been held over for a murder charge, for sure not for a murder charge. And then, secondly, Your Honor, again, if this is out of ECBA context, and it is, it is not controlled by ECBA, this court has held unambiguously just a presentation of false evidence or lying to the court in and of itself shouldn't result in a 24-7 conviction. And the case went to trial on a second-degree murder charge, and the jury returned the lesser included. Would this? Yes. Yes, Your Honor. Okay. Yes. I'm volunteering that, sir. All right. Thank you very much. Thank you. Thank you, both sides, for the very helpful arguments. Thank you. This case is submitted.
judges: BERZON, TALLMAN, FRIEDLAND